IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                 Case No: 6:26-cv-655-JSS-LHP

UNITED PARKS & RESORTS INC. et al.,

    Defendants.

_____/

## **UPR'S MOTION TO DISMISS THE COMPLAINT**

Pursuant to Rules 12(b)(6), 8(a), 10(b), and 65(d) of the Federal Rules of Civil Procedure, Defendants United Parks & Resorts, Inc.; SeaWorld Parks & Entertainment, Inc.; SeaWorld Parks & Entertainment LLC (d/b/a Busch Gardens Tampa); Sea World of Florida LLC (d/b/a SeaWorld Orlando, Discovery Cove, and Aquatica); and Sea World LLC (d/b/a SeaWorld Parks & Resorts Orlando) (collectively "Defendants" or "UPR"), respectfully move this Court to dismiss the Complaint.

### **PRELIMINARY STATEMENT**

UPR—a leading theme park and entertainment company that owns and operates a portfolio of award-winning park brands and experiences—implemented a reasonable and necessary safety policy prohibiting its guests from using rollators with seats at certain of its parks because guests routinely misused the rollators by

sitting on them and being pushed around as if they were wheelchairs, in direct violation of manufacturer instructions. The policy was, and is, designed to ensure the continued safety of UPR's guests and employees.

The implementation of this policy was not taken lightly. UPR came to its decision to prohibit rollators with seats at some of its parks following a series of accidents due to guest misuse that less restrictive measures had failed to prevent. But it did not simply ban those devices and leave it at that. UPR provided guests who used or arrived at the parks with a prohibited rollator with alternatives at no cost. This commonsense approach balanced the safety and accessibility needs of its guests and provided a thoughtful and reasonable solution to a complicated problem.

Then the Government appeared. Through its uninformed and misguided lawsuit, the Government seeks to forcibly end UPR's critical safety policy while ignoring the reasons behind it and UPR's extensive efforts to ensure access to its parks to all guests by providing safer alternatives to the banned rollators.

The Complaint ignores inconvenient but relevant facts and turns a statute designed to help people on its head by insisting on a result that would make them less safe. The Complaint, for example, correctly acknowledges that under the law, restrictions may be permissible where "necessary for safe operation." Dkt. 1 ¶ 8. Yet it makes no mention of the real and legitimate safety issues that triggered UPR's policy. Equally baffling is the indifference throughout the Complaint to the requirements that the Government's requested modifications to UPR's policy must

2

be reasonable and necessary, central elements of the Americans with Disabilities Act ("ADA"). These and other failures manifest themselves in ways that render the Complaint fatally deficient and subject to dismissal.

*First*, the Complaint is an impermissible shotgun pleading. It makes no effort to set out its claims by count, instead choosing to cram three different legal theories into an omnibus section entitled "Cause of Action," with each legal theory incorporating by reference the allegations contained in the one that preceded it. The result is a confusing mishmash of conclusory and vague allegations that fails to provide UPR with the requisite notice of the claims it must defend against and, critically, the factual allegations underlying those claims.

*Second*, the Complaint fails to allege facts sufficient to plausibly establish that the modifications being sought by the government are reasonable and necessary to afford access to the parks, given the significant safety issues presented. UPR strives to ensure that its parks are safe and accessible for all its guests. Beyond what the law strictly requires UPR to do, UPR takes steps to keep its guests safe because it is the right thing to do. The Government, however, appears to labor under the misapprehension that UPR's guests are allowed *any* modification (not just *reasonable* ones) and fails to allege facts sufficient to support its claim under the law. Nor does the Government allege facts sufficient to show that its requested modification is necessary to provide guests with access to the parks. To the contrary, a forced elimination of UPR's policy prohibiting seated rollators is hardly necessary to ensure access. The policy does not refuse entry or

3

deny access. It instead provides alternative manual mobility aids at no cost for those who use rollators with seats.

*Third*, UPR's policy is necessary for safe operations. UPR is specifically authorized by the Government's regulations to impose "legitimate safety requirements" necessary for the safe operation of its parks. That is exactly why UPR implemented its seated-rollator restriction: people were getting seriously injured through seated-rollator misuse. The safety issues in this matter are not speculative or the result of stereotypes. There are actual safety risks arising from guests' misuse of seated rollators, manifested through numerous serious accidents that left guests with devastating injuries. The Complaint does not allege otherwise. Nor does it allege facts to support a contrary view.

*Fourth*, the Government's conclusory claim that UPR charges guests who bring rollators with seats to its Orlando parks a fee for alternative mobility aids is wrong.

*Fifth*, the Complaint fails to allege facts sufficient to establish that UPR prohibited individuals from using manually powered mobility aids. The policy does not ban all manually powered mobility aids; it restricts one specific type—rollators with seats—based on serious and proven safety risks caused by misuse. Other manually powered mobility aids are allowed. In fact, UPR provides them at no cost to individuals who arrive with a seated rollator. If, as the Government suggests, the applicable regulation mandates that UPR must allow all manual mobility devices

without consideration to safety, then the regulation is inconsistent with the ADA and should be voided.

*Finally*, requests for injunctions demanding a defendant do nothing more specific than "obey the law," failing to provide a restrained party fair notice of what conduct will risk contempt, are impermissible in the Eleventh Circuit. Accordingly, the Government's broad and ambiguous requests for injunctive relief are improper and ripe for the Court's dismissal.

## BACKGROUND

In response to manifest safety concerns that misuse of rollators with seats posed to guests, UPR updated its safety policy in November 2025 to prohibit rollators with seats at its three Orlando parks, SeaWorld, Aquatica, and Discovery Cove. Dkt. 1 ¶ 23. UPR implemented this policy after numerous guests suffered serious accidents and injuries from misuse of rollators with seats in these parks. *Id.* ¶¶ 24 and 36.

In particular—and as UPR plainly warned guests on its website—UPR experienced repeated safety incidents involving guests pushing other guests sitting on rollators as if they were makeshift "wheelchairs." *Id.* ¶ 36. Leading up to the policy update, numerous guests were injured as a result of seated-rollator misuse.

The policy update followed UPR's careful attempts to correct rollator misuse in a less restrictive way. UPR had attempted to address the problem by reminding guests of appropriate ways to use rollators with seats and having them sign waivers. *Id.* Despite these steps, UPR continued to see seated-rollator misuse and

related safety incidents. *Id.* For this reason, out of concern for guest safety and after other measures failed, UPR had no choice but to adopt its closely tailored safety policy prohibiting rollators with seats in Orlando-area parks.[1] *Id.*

Mindful of the needs of guests with disabilities, UPR of course did not just leave things at a blanket ban of rollators with seats. In lieu of rollators with seats, UPR provides alternative options, including standard wheelchairs, Electronic Conveyance Vehicles ("ECVs"), and, starting in December 2025, even a fleet of the very same mobility aid at issue—rollators, just without seats. *Id.* ¶¶ 24, 36.

UPR's initial publication of the policy was silent as to its provision of alternatives free of charge, though it quickly clarified that "[i]n addition to permitting personal rollators without seats, we provide complimentary rollators (without seats) for guests who arrive with a device that does not meet this policy. . . . A complimentary wheelchair is also available for guests who prefer that option. . . ." *Id.* ¶ 36. The Complaint fails to allege with required specificity—nor can it credibly do so—that UPR intended to charge its guests for these assistive devices after updating its policy.

The Government vaguely alleges that it received an indeterminate amount of complaints ("numerous complaints") after UPR updated its policy. *Id.* ¶ 38. Failing to specify either the number or the substance of the complaints, it picks out

---

[1] Although the Complaint alleges this policy was included for a couple of months in the "Accessibility" portion of its website, Busch Gardens Tampa Bay has not yet implemented the policy.

a few details from four such complaints as the basis for UPR's alleged violations of Title III of the ADA. *Id.* ¶¶ 39-41.

As alleged, the first individual never even attempted to visit SeaWorld Orlando—nor is it apparent she had any plans to do so. *Id.* ¶ 39. The guest simply e-mailed SeaWorld Orlando to ask whether her child's device would be permitted in the park. *Id.* SeaWorld Orlando confirmed that rollators with seats were not permitted but offered reasonable alternatives. *Id.* The Complaint does not allege that the child's rollator was "necessary" or that the alternatives were not "reasonable." *Id.* Instead, the Complaint is limited to the conclusory statements that the child's rollator was "selected by the child's medical team" and that the offered wheelchair was not "medically appropriate" for the child. *Id.* There is no allegation that the guest asked to be provided with a different wheelchair, that the use of a wheelchair would have limited the individual's access to any area of the park, or that the guest's decision not to visit the park had anything to do with the policy.

The Complaint next alleges that two veterans visited SeaWorld Orlando in November 2025, shortly after the policy's implementation. *Id.* ¶ 40. One of them was provided with a complimentary wheelchair, and he visited the park. *Id.* There are no allegations that his experience was impacted negatively by use of the wheelchair or that he was denied access to any portion of the park. *Id.* Instead, the Complaint alleges without specificity that the individual "had to use a wheelchair against his physician's medical advice." *Id.*

7

The other individual was allegedly not immediately offered a free wheelchair (though there is no allegation that he was told he would be charged for one). *Id.* He left the park without entering, but not for that reason. *Id.* The Complaint alleges that "it was infeasible for his wife to push him in a wheelchair," with no explanation as to what was "infeasible" about the situation, how use of a wheelchair would have limited his access to any part of the park, or whether anyone else in his party was available to push the wheelchair. *Id.* It also is silent as to how a complimentary rollator without a seat or an ECV would not have worked for the guest. *Id.*

The Complaint alleges the fourth individual has "a rollator [with a seat] designed to accommodate his height." *Id.* ¶ 41. The individual was offered a rollator without a seat, "but it was not tall enough to accommodate his height."[2] *Id.* There is no allegation he was asked to pay a fee for use of that rollator. A wheelchair was not available on the first day of his trip, so the individual used the complimentary rollator without a seat that day. *Id.* The individual was not deterred from returning to the parks and alternated "between using UPR's walker and a wheelchair throughout his visits to SeaWorld Orlando and Discovery Cove Orlando over the rest of his multi-day trip." *Id.* The Complaint does not allege the rollator with a seat was "necessary," that the rollator without a seat and wheelchair were not "reasonable," or that the individual was denied access to any area of the park due

---

[2] Since November 2025, UPR has worked to build out its fleet of rollators without seats available for guest use. These now include rollators to accommodate guests with additional height and weight concerns and rollators designed for use by children if the guest prefers not to use a complimentary wheelchair. The Government, whose investigation was opened in November 2025 and continued through the filing of this lawsuit, omits this information from its Complaint.

to his use of a rollator without a seat and a wheelchair. *Id.* Rather, the Complaint contends that use of the rollator without a seat and wheelchair "diminished his and his family's experiences at UPR parks," without providing any additional facts to support this contention or link it to some alleged discrimination under the ADA. *Id.*

Beyond the vague snapshots provided by these four examples, the Complaint summarily alleges—while failing to provide any details—that other individuals with various mobility issues were discriminated against in violation of Title III.

On March 26, 2026, the Government filed this Complaint seeking declaratory and injunctive relief, monetary damages, and a civil penalty. The Complaint does not set out any counts. Instead, it finishes with a section entitled "Cause of Action." Almost as an afterthought, the Government uses this section to hurriedly recite the formulas for three different legal theories of ADA liability. This section is almost completely devoid of factual content. Instead, each legal theory incorporates by reference every preceding paragraph and legal theory alleged in the Complaint, culminating with the final legal theory incorporating by reference every paragraph in the Complaint and the two other legal theories.

**STANDARD OF REVIEW**

Where a complaint fails to state a claim upon which relief can be granted, the claim should be dismissed under Rule 12(b)(6*). See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To state a claim upon which relief may be granted, a complaint must set forth "a short and plain statement of the claim showing that

9

the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8(a)(2) and survive a Rule 12(b)(6) challenge, the factual allegations in the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 550). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* To meet this standard, facts alleged in the complaint must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570.

If doing so would promote clarity, Federal Rule of Civil Procedure 10(b) requires a plaintiff to state "each claim founded on a separate transaction or occurrence … in a separate count." Fed. R. Civ. P. 10(b). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

## ARGUMENT

### I.      The Complaint is an impermissible shotgun pleading.

As demonstrated in Sections II through V, *infra*, UPR has had to carefully parse the Complaint in order to construe and articulate the claims asserted against

it and why those claims fail. That is because, in failing to clearly link its legal theories with the facts alleged, the Complaint constitutes an impermissible shotgun pleading. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland,* 792 F.3d at 1323.

The Complaint is a shotgun pleading, first, because it does not separate each cause of action into a distinct count. *See Mika v. Rollins College*, Case No: 6:25-cv-1110-JSS-RMN, 2026 WL 679128, at *4 (M.D. Fla. 2026) (finding a complaint that did not separate causes of action into distinct counts to be a shotgun pleading). For example, the Government alleges distinct Title III violations under various implementing regulations but just one cause of action asserting all of these separate, unenumerated legal theories. "Plaintiff 'may not cram multiple, distinct theories of liability into one claim because each theory is a separate cause of action that must be asserted independently and with corresponding supporting factual allegations.'" *Id.* (quoting *Miles v. Carnival Corp.*, 767 F. Supp. 3d 1368, 1373 (S.D. Fla. 2025)).

Second, the Complaint "adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* at *3 (quoting *Weiland*, 792 F.3d at 1321) (citation omitted); Dkt. 1, ¶¶ 43, 50, 56. In so doing, the Complaint impermissibly builds on each prior legal theory, realleging and incorporating by

11

reference the allegations in all preceding paragraphs. As a result, the final alleged ADA violation encompasses the entirety of the Complaint yet fails to specify the factual basis for the claim.

Third, the Complaint contains "conclusory, vague, and immaterial facts." *See id.* at \*4 (citing *Weiland*, 792 F.3d at 1322). The Government sets forth only the most conclusory allegations regarding its claims of Title III violations and omits mention of critical claim elements, providing little factual support for its claims. As a result, UPR and the Court are left to speculate as to whether any violation of Title III occurred or whether, in fact, UPR's policy is consistent with the ADA.

## II. The Government has failed to plausibly allege how eliminating the safety-based seated-rollator restriction is a reasonable or necessary policy modification under the ADA.

Title III of the ADA prohibits discrimination against an individual "on the basis of disability in . . . any place of public accommodation by a person who owns, leases . . . or operates a place of public accommodation." 42 U.S.C. § 12182(a). The ADA defines prohibited discrimination as including:

> "[A] failure to make *reasonable* modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. . . ."

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).

As stated above in Section I, the Complaint fails to directly connect its legal theories with its factual allegations, making the Government's position difficult to

12

discern. For purposes of this Motion, UPR assumes that the Government alleges that the seated-rollator restriction is a purported violation of a public accommodation's duty not to refuse to permit individuals with disabilities from using manually powered mobility aids in areas open to pedestrian use. 42 U.S.C. § 12182(b)(1)(E); 28 C.F.R. §§ 36.311(a), 36.205. UPR also must assume the Government means that the restriction allegedly denies individuals with disabilities from participating in or benefiting from UPR's goods, services, facilities, privileges, advantages, or accommodations.[3]  42  U.S.C. §§ 12182(b)(1)(A)(i), 12182(b)(1)(E); 28 C.F.R. §§ 36.202(a), 36.205.

To establish a violation of the controlling statutory provision on reasonable modifications, 42 U.S.C. § 12182(b)(2)(A)(ii), the Government must allege that its policy modification is "reasonable." The Government must also show that its requested modification is "necessary"—a separate element for claims under § 12182(b)(2)(A)(ii). The Government has failed to adequately plead either.

> *A. Eliminating the safety-based seated-rollator restriction is not a reasonable policy modification under the ADA.*

*First*, under 42 U.S.C. § 12182(b)(2)(A)(ii), the Government must show the requested accommodation is "reasonable." The Government fails to allege any facts that an exception allowing a rollator with a seat is reasonable—which it

---

[3] Similarly, UPR must assume that the Government alleges the seated-rollator restriction is a purported violation of the prohibition on a public accommodation's imposing or applying eligibility criteria that screen out individuals with disabilities from fully and equally enjoying UPR's goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(2)(A)(i), 12182(b)(1)(E); 28 C.F.R. §§ 36.301(a), 36.205.

cannot credibly do in light of the numerous safety incidents UPR experienced and the ample alternative accommodations that are provided.

Instead, the Government appears to be under the misimpression that guests are allowed *any* modification, regardless of reasonableness, so long as it was requested. This is simply not the law. Consistent with well-established legal precedent, guests are entitled to a *reasonable* accommodation, not the accommodation of their choice. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001); *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) ("Stated plainly, under the ADA a qualified individual with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation."); *Ault v. Walt Disney World Co.*, 254 F.R.D. 680, 688 (M.D. Fla. 2009) (explaining that a preference to use a Segway over other types of mobility devices need not, as a matter of law, be accommodated under the ADA), *vacated on other grounds*, No. 6:07-cv-1785-ORL-31KRS, 2009 WL 3242028 (M.D. Fla. Oct. 6, 2009), *vacated* 405 F. Appx. 401 (11th Cir. 2010); *A.L., by and through D.L. v. Walt Disney Parks and Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1304 (M.D. Fla. 2020) (public accommodations "are not required to make the preferred accommodation of plaintiffs' choice" nor are they "required to make any and all possible accommodations that would provide full and equal access to disabled patrons") (citations omitted), *aff'd sub nom. A. L. by and through D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097 (11th Cir. 2022). Because it has

14

not alleged facts sufficient to show the requested modification is reasonable, the Government has failed to plead a Title III violation.

### B. Nor is eliminating the safety-based seated-rollator restriction a necessary policy modification under the ADA.

The Government has also failed to sufficiently allege lifting the seated-rollator restriction is a "necessary" accommodation under the ADA. The Supreme Court has stated that a requested modification is not required under Title III unless "necessary to afford access" to defendant's facilities. *Martin*, 532 U.S. at 688.

A modification is not "necessary" even where access to a public accommodation may be "uncomfortable or difficult" without it. *Id.* Instead, a Title III plaintiff must show access to the public accommodation is "beyond their capacity" unless the modification is made. *Id.*; *see also Baughman v. Walt Disney World Co.*, 691 F. Supp. 2d 1092, 1095 (C.D. Cal. 2010) ("For a requested modification to be necessary, a plaintiff must show that she would be effectively excluded from the public accommodation without the modification.") (citing *Lentini v. California Center for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004)), *rev'd and remanded*, 685 F.3d 1131 (9th Cir. 2012); *A.L.*, 469 F. Supp. 3d at 1303 (recognizing that "[i]t is not enough to show that the . . . [defendant's policy] does not eliminate all discomfort or difficulty"). No detail picked out from the four guest complaints (as alleged by the Government) rises to this level.

Moreover, the availability of alternative mobility aids—including the *very same walker* but without the seat—is independent proof that lifting the seated-rollator restriction is not "necessary" to afford a guest equal access. Indeed,

numerous courts have held that a requested modification is not necessary where alternate accommodations were available. *See, e.g., Murphy v. Bridger Bowl*, 150 Fed. Appx. 661, 663 (9th Cir. 2005) (requested modification of resort policy to permit companion to accompany disabled plaintiff on a ski bike not necessary to improve her skills because alternative methods were available to assist plaintiff); *see also Logan v. Am. Contract Bridge League*, 173 Fed. Appx. 113, 116-117 (3d Cir. 2006) (requested modification to use special cards in bridge club not necessary because, despite enhancing disabled plaintiff's ability to play, modification was not necessary to afford access to games in light of the alternate accommodations).

Tellingly, and as laid out above, the Government's allegations uniformly fall short of showing that any guest was denied an equal opportunity for access to UPR parks through their use of any of UPR's complimentary alternatives.[4] On the contrary, several of the Government's allegations prove the opposite. For example, as the Government acknowledges, one of the individuals detailed in its Complaint was provided a complimentary wheelchair as an alternative to his seated rollator and proceeded with his visit to SeaWorld Orlando. Dkt. 1 ¶ 40. There is no allegation his access to the park was limited by his use of this free alternative.

---

[4] The Eleventh Circuit has held that "public accommodations must start by considering how their facilities are used by nondisabled guests and then must take reasonable steps to provide disabled guests with a 'like experience.'" *A.L.*, 900 F.3d 1270 at 1296 (citations omitted). Applied in this case, this analysis involves consideration of two factors: (1) how nondisabled guests use UPR facilities; and (2) whether UPR's complimentary alternatives provide disabled guests with a like experience and equal enjoyment. *See id.* Both of those factors support the lawfulness of UPR's policy. The facts are undisputed that a guest using any of UPR's complimentary alternatives is able to access the park in the same manner as a nondisabled guest. In other words, they have "meaningful access," and it is not "beyond their capacity" to access the same areas of the park using something other than a rollator with a seat.

*C. The seated-rollator restriction is justified by UPR's legal authority to impose legitimate safety requirements.*

While UPR takes action to keep its guests safe because it is the right and responsible thing to do, the law also specifically authorizes it to do so. The ADA's obligations on public accommodations are far from absolute. Perhaps the most notable carveout to the ADA's obligations has to do with safety. "A public accommodation may impose legitimate safety requirements that are necessary for safe operation." 28 C.F.R. § 36.301(b).

Courts tend to reject safety justifications based not on "actual risks" but "mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*; *see, e.g., Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245 (11th Cir. 2023) (refusal to permit patron with only one hand on ride violated ADA given no showing of "actual risks" to people like plaintiff); *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 181 (3d Cir. 2019) (rejecting safety justification for limiting plasma donations by disabled individuals using service animals as "clearly speculative and to generalize widely about individuals who use psychiatric service animals"); *cf. Dick v. City & Borough of Sitka*, 2023 WL 9045495, at *7 (D. Alaska 2023) (noting potential merit of defendant's safety justification for banning use of golf cart on roadways but also observing city's history of permitting such use).

UPR's safety justification is hardly an impermissible pretext. UPR has a proven history of safety incidents due to guests' misuse of rollators with seats motivating its policy to ban such mobility devices at its parks. To the Government,

17

this weighty safety rationale does not even merit a passing mention in its Complaint.

One can better appreciate the distinction between "actual risks" and mere speculation and stereotype through a comparison of two comparable cases challenging a Disney prohibition on Segway use. In *Baughman v. Walt Disney World Co.*, the Ninth Circuit found that a particular patron's request to use a Segway was a necessary and reasonable modification to the Disney prohibition. 685 F.3d 1131 (9th Cir. 2012). However, in so holding, the court also suggested Disney could maintain a broader prohibition on Segways if based on "actual risks":

> We do not hold that Disney must permit Segways [i.e., for others] at its theme parks. It might be able to exclude them if it can prove that Segways can't be operated safely in its parks. . . . Disney might, for example, permissibly require Segways to travel only as fast as motorized wheelchairs. But any safety requirements Disney imposes 'must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.' New technology presents risks as well as opportunities; we must not allow fear of the former to deprive us of the latter.

*Id.* at 1137 (citations omitted).

In a separate case over the Segway prohibition, the Eleventh Circuit decided in Disney's favor, distinguishing *Baughman* and noting the importance of a demonstrated safety rationale. *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1217 n.4 (11th Cir. 2012) ("The Ninth Circuit did not hold that Title III requires Disney to permit Segways® in Disney Resorts and, in fact, explicitly stated that Segways® can be excluded if Disney determines that the safety factors listed in 28 C.F.R. § 36.311(b)(2) warrant exclusion. . . . In the present case, the district court found

18

that if this action went to trial, Disney was likely to prevail because of its reliance upon those exact safety factors.").

Yet again, the Government fails to address this crucial legal justification for the seated-rollator restriction in its Complaint. UPR understood its legal authority to impose safety requirements as consonant with a commonsense responsibility and moral duty to keep guests safe. Because this legal authority justified its policy, the Government has failed to plead a Title III violation.

### III.   UPR never had a policy of charging fees for use of alternative mobility aids.

The Government's claim that UPR charges guests who arrive with seated rollators for alternative mobility aids is facially incorrect. A public accommodation may not impose surcharges on disabled guests to cover costs of measures required to provide them with nondiscriminatory treatment. 42 U.S.C. §§ 12182(b)(2)(A)(i), 12182(b)(1)(E); 28 C.F.R. §§ 36.301(c), 36.205.

The Government is simply wrong even on the facts as alleged. When UPR enacted its safety policy on seated rollators in November 2025, the policy did not suggest that guests would be charged for alternative mobility aids. Initially, the policy was silent on the fact that UPR would provide assistive devices for free. Recognizing this ambiguity, UPR quickly clarified its policy: "In addition to permitting personal rollators without seats, we provide complimentary rollators (without seats) for guests who arrive with a device that does not meet this policy. . . . A complimentary wheelchair is also available for guests who prefer that option. . . ." Dkt. 1, ¶ 36.

19

Stated more precisely, UPR never implemented any policy that required its guests to rent these mobility devices to replace a seated rollator. The Government makes no allegations to the contrary. Instead, the Government tries to show UPR intended to charge its guests by applying a convenient gloss on unrelated policies. The Government mistakenly implies that UPR's notice, in one part of a park's website, stating that alternative aids were available for rent to guests who arrive without their own, meant that parks would charge those fees to guests who arrive at the parks with seated rollators. *Id.* ¶ 26. As UPR's follow-up clarification informed guests, it was never UPR's policy to charge those guests for rollators without seats or wheelchairs—not at those general rental prices or any other price.

Of the four individuals discussed in the Complaint, only one represented that he was told he would need to rent a wheelchair or ECV when he visited SeaWorld Orlando shortly after UPR enacted its safety policy. This person, however, was not charged, and the Complaint concedes he was provided a wheelchair free of charge. *Id.* at ¶ 40. In the months since the policy was enacted, the Government does not cite a single complaint that UPR charged for an alternative mobility device.

The reason for this lack of examples is simple: UPR's policy has never been to charge for wheelchairs or rollators without seats. The contrary testimony of one guest is an insufficient foundation for a Title III case. To establish the required pattern or practice of discrimination under Title III, the Government must prove more than an isolated incident or an accidental act; it must prove discrimination

20

is the defendant's "standard operating procedure." *United States v. Fountain View Apartments, Inc.*, 2009 WL 10671251, at *6 (M.D. Fla. 2009) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

Here, the Government has failed to allege more than an isolated conversation—and not even a single instance of a monetary transaction charging a guest for a replacement rollator. The Government has failed to allege UPR had a "pattern or practice" of charging for assistive devices to replace prohibited rollators with seats. Moreover, failing to plausibly allege such a policy, the Government cannot credibly allege that this raises an issue of public importance.

**IV.    If the regulation relating to use of manually powered mobility aids is as strict as the Government says, then the regulation is contrary to the ADA's plain language and should be set aside.**

The Government's reliance on 28 C.F.R. § 36.311(a) to support a Title III violation is misplaced. The Government suggests the regulation is absolute—that a public accommodation "must permit" *any* manually powered mobility aid in areas open to pedestrian use. Dkt. 1 ¶ 7.

There is a more sensible reading that is faithful to the text of the regulation and consistent with the language of the ADA. The regulation does not say guests should be permitted to use "any" manually powered mobility aid. In fact, 28 C.F.R. § 36.301(b) permits public accommodations to impose legitimate safety requirements necessary for their safe operation, and the ADA only requires public accommodations to make "reasonable" and "necessary" policy modifications for individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii). Read properly, 28

21

C.F.R. § 36.311(a) cannot require public accommodations to permit a mobility aid in the face of a legitimate safety reason.

The Government's reading of the regulation conflicts with the plain language of Title III, which requires that a requested modification be "reasonable" and "necessary." As alleged, the Complaint is based on an impermissibly absolute regulation that simply does not fit with the statutory language Congress carefully designed to permit exceptions—especially for reasons of safety. *See A.L.*, 900 F.3d at 1293. "[I]n *any* conflict between a statute and a regulation purporting to implement the statutes provision, the regulation must, of course, give way." *McComb v. Wambaugh*, 934 F.2d 474, 481 (3d Cir. 1991) (emphasis added).

In *Ault v. Walt Disney World Co.*, the court found the analogous prohibition of 28 C.F.R. § 36.311(b) on "power-driven mobility devices" was invalid because "the DOJ's revised regulations conflict with the plain language of Title III, which requires that a requested modification be necessary for a disabled individual to be afforded goods or services." 2011 WL 1460181, at *3.

The same rationale holds for 28 C.F.R. § 36.311(a) and for rejecting the imposition of any absolute obligation for public accommodations to permit individuals to "[u]se wheelchairs and manually-powered mobility aids" without regard to safety, reasonableness, or necessity. In *Ault*, the court compared the statute and 28 C.F.R. § 36.311(b) and found it fatal that the regulation's unqualified language contained no reference to the requested modification needing to be both "reasonable" and "necessary." *Id.* at *3 n.6. The side-by-side comparison below

demonstrates the same impermissible conflict between the ADA and 28 C.F.R. § 36.311(a):

| 42 U.S.C. § 12182(b)(2)(A)(ii) | 28 C.F.R. § 36.311(a) |
|---|---|
| "[D]iscrimination includes … a failure to make *reasonable* modifications in policies, practices, or procedures, *when such modifications are necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." (emphasis added) | "A public accommodation *shall permit* individuals with mobility disabilities to use wheelchairs and manually-powered mobility aids, such as walkers, crutches, canes, braces, or other similar devices designed for use by individuals with mobility disabilities in any areas open to pedestrian use." (emphasis added) |

Even after according the Justice Department's construction of the statute due *Chevron* deference (as was then required), the court in *Ault* found that Disney World "would likely be able to maintain its ban on Segways in light of its safety concerns." *Id.* Now that *Chevron* has been overruled, 28 C.F.R. § 36.311(a) is not entitled to *any* deference. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The regulation should be evaluated based on whether it comports with the plain language of § 12182(b)(2)(A)(ii). *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) (invalidating subsection of regulation for "its conflict with the unequivocal language of the statute"). As established above, if the Government's absolute reading is correct, the regulation conflicts with the ADA's plain language and thus cannot support even adequately pleaded liability.

**V.    The Government seeks an impermissible "obey the law" injunction.**

It is well-established in the Eleventh Circuit that "an injunction demanding that a party do nothing more specific than obey the law is impermissible." *Powers v. Health First, Inc.*, No. 5:230-cv-0375-JSS-RMN, 2026 WL 850550, at \*12 (M.D. Fla. Mar. 27, 2026) (citing *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006)). An injunction must contain a clear command capable of enforcement because "[w]ithout specific and enforceable language, an injunction does not give the restrained party fair notice of what conduct will risk contempt." *Id.* (citation omitted); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 984-85 (11th Cir. 1983) ("[T]he injunction should clearly let defendant know what he is ordered to do or not to do. [It] should be phrased in terms of objective actions, not legal conclusions. An injunction which merely forbids a defendant from performing "acts of unfair competition," or from "infringing on plaintiff's trademarks and trade secrets" adds nothing to what the law already requires.") (citation omitted).

Here, the Government broadly requests the Court enjoin UPR from "discriminating against individuals with disabilities" and "failing to comply with Title III of the ADA." Doc. 1, p. 19. It further seeks the Court require "UPR to modify its policies, practices, and procedures to comply with Title III of the ADA" and "provide ADA training to its officers, against, employees ... to a proficient level to meet the ADA." *Id.* at 19-20. The Eleventh Circuit unambiguously disallows such

24

vague and unenforceable requests, and the Court should dismiss the Government's claims for injunctive relief.

## CONCLUSION

The Government has not adequately pleaded any ADA violation in UPR's closely tailored safety policy of prohibiting the use of rollators with seats at its parks—especially not in view of free alternatives UPR conscientiously provides guests with disabilities. Moreover, the barebones Complaint is an impermissible shotgun pleading seeking impermissible injunctive relief. The Court should dismiss the Complaint in its entirety.

Dated: May 26, 2026                    Respectfully submitted,


                                       _/s/ Roger B. Handberg_____
                                       ROGER B. HANDBERG
                                       LEAD COUNSEL
                                       Florida Bar No. 241570
                                       JULIE POSTERARO
                                       Florida Bar No. 1065271
                                       GrayRobinson, P.A.
                                       301 E. Pine Street, Suite 1400
                                       Orlando, Florida 32802-3068
                                       (407) 843-8880 Telephone
                                       (407) 244-5690 Facsimile
                                       Roger.Handberg@gray-robinson.com
                                       Julie.Posteraro@gray-robinson.com


                                       ROBERT K. HUR
                                       District of Columbia Bar No. 496269
                                       (*pro hac vice* forthcoming)
                                       COREY AMUNDSON
                                       Louisiana Bar No. 27848
                                       (*pro hac vice* forthcoming)
                                       King & Spalding LLP
                                       1700 Pennsylvania Avenue, NW

Suite 900
Washington, DC 20006
(202) 737-0500 Telephone
(202) 626-3737 Facsimile
rhur@kslaw.com
camundson@kslaw.com

MARC E. KASOWITZ
New York Attorney No. 1309871
(*pro hac vice* forthcoming)
JONATHAN L. SHAPIRO
New York Attorney No. 4689220
(*pro hac vice* forthcoming)
Kasowitz LLP
1633 Broadway
New York, NY 10019
(212) 506-1700 Telephone
(212) 506-1800 Facsimile
mkasowitz@kasowitz.com
jshapiro@kasowitz.com

*Counsel for Defendants*

26

## LOCAL RULE 3.01(g) CERTIFICATE

In compliance with Local Rule 3.01(g), the undersigned certifies that 1) Defendants' counsel conferred with counsel for the Government in a good-faith effort to resolve the issues raised in this motion, 2) the parties were not able to come to an agreement on the resolution of all or part of the motion, and 3) the conference occurred by WebEx among Roger Handberg, Julie Posteraro, David Gardner, Yohance Pettis, and Alexandra Karahalios on May 22, 2026.

  */s/ Roger B. Handberg*
ROGER B. HANDBERG

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 26, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

  */s/ Roger B. Handberg*
ROGER B. HANDBERG